Daniel Cooper (State Bar No. 153576)
Drevet Hunt (State Bar No. 240487)
LAWYERS FOR CLEAN WATER, INC.
1004 A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155
Email: cleanwater@sfo.com
        drev@lawyersforcleanwater.com

Christopher Sproul (State Bar No. 126398)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California  94121
Telephone:  (415) 533-3376
Facsimile:  (415) 358-5695
Email: csproul@enviroadvocates.com

Counsel for Plaintiff
KLAMATH RIVERKEEPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KLAMATH RIVERKEEPER, a non-profit public benefit corporation organized under the laws of the State of California,<br><br>     Plaintiff,<br><br>       v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, STEPHEN L. JOHNSON, as Administrator of the United States Environmental Protection Agency, and WAYNE NASTRI, as Regional Administrator of the United States Environmental Protection Agency, Region 9,<br><br>     Defendants. | Case No. 3:07-cv-03908-WHA<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Fed. R. Civ. P. 56<br><br>Judge: Honorable William H. Alsup<br>Date:   March 13, 2007<br>Time:  8:00 a.m.<br>Place:  Courtroom 9, 19th Floor |

## **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE THAT, on MARCH 13, 2008 at 8:00 a.m., pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Klamath Riverkeeper ("Riverkeeper") will move this Court to grant it summary judgment on its claim that the defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance in the law.  The motion will be heard by the Honorable William H. Alsup, District Court Judge of the United States District Court for the Northern District of California, in Courtroom 9 of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102.

Riverkeeper moves the Court on the grounds that Defendants United States Environmental Protection Agency, Stephen Johnson, as Administrator of the United States Environmental Protection Agency, and Wayne Nastri, as Regional Administrator of the United States Environmental Protection Agency, Region 9 (collectively "the EPA"), have acted in a manner that is arbitrary, capricious, or otherwise not in accordance with the law in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or CWA").  Specifically, Riverkeeper avers that EPA's approval of the 2006 iteration of California's CWA § 303(d) list of waters not meeting applicable water quality standards due impairment by specific pollutants was arbitrary, capricious and otherwise contrary to CWA requirements because the List fails to identify the pollutants *Microcystis aeruginosa* and microcystin toxin as among the pollutants causing portions of the Klamath River and the Iron Gate and Copco Reservoirs to violate applicable water quality standards, despite incontrovertible evidence in the Administrative Record that *Microcystis aeruginosa* and microcystin toxin are pollutants that are causing these waters not to meet applicable water quality standards.

DATED: December 19, 2007                    ENVIRONMENTAL ADVOCATES


_____
      /s/
Christopher Sproul
Attorneys for Riverkeepers
KLAMATH RIVERKEEPER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.    INTRODUCTION ................................................................................................................ 1

II.   STATUTORY AND REGULATORY BACKGROUND ...................................................... 2

      A.  General CWA and Regulatory Background ................................................................ 2

      B.  State WQS ................................................................................................................... 4

III.  FACTS ................................................................................................................................. 5

      A.  The Reach's Impairment by *M. aeruginosa* and the Toxin ........................................ 5

      B.  State Board and EPA Action on the California 303(d) List ...................................... 10

IV.   STANDARD OF REVIEW ................................................................................................ 11

V.    ARGUMENT ..................................................................................................................... 12

      A.  EPA's Failure To Identify in California's 303(d) List *M. aeruginosa* and
          Microsystin Toxin as Pollutants Impairing the Klamath River Was Erroneous...................... 12

          1.  *M. aeruginosa* and The Toxin Are Pollutants .................................................. 13

          2.  *M. aeruginosa* and the Toxin Are Causing the Klamath River Not to Meet
              WQS ................................................................................................................... 13

          3.  The State and EPA Must Include All Pollutants Causing Violations of WQS on
              the 2006 303(d) List .......................................................................................... 15

          4.  EPA Erroneously Relied on Improper Factors and Failed to Consider Relevant
              Factors in Approving the 2006 303(d) List........................................................ 17

      B.  The Court Should Set Aside EPA's Approval of the 2006 303(d) List and Issue
          Appropriate Declaratory Relief............................................................................... 22

VI.   CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                          <u>Page</u>

*Abramowitz v. EPA,*
    832 F.2d 1071 (9th Cir.1987) ................................................................................ 22

*Am. Canoe Ass'n v. EPA,*
    30 F. Supp. 2d 908 (D. Va. 1998) ........................................................................ 11

*Am. Littoral Soc'y v. United States EPA,*
    199 F. Supp. 2d 217 (D. N.J. 2002) ..................................................................... 17

*Am. Paper Institute, Inc. v. EPA,*
    890 F.2d 869 (7th Cir. 1989) .................................................................................. 2

*Arkansas v. Oklahoma,*
    503 U.S. 91, 112 S. Ct. 1046 (1992) ...................................................................... 4

*Bilbrey by Bilbrey v. Brown,*
    738 F.2d 1462 (9th Cir. 1984) .............................................................................. 24

*Bowen v. Georgetown Univ. Hospital,*
    488 U.S. 204 (1988) ............................................................................................. 12

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402, 91 S. Ct. 814 (1971) ...................................................................... 11

*City of Arcadia v. EPA,*
    411 F.3d 1103 (9th Cir. 2005) ......................................................................... 20, 21

*Committee to Save Mokelumne River v. East Bay Municipal Utility Dist.,*
    13 F.3d 305 (9th Cir. 1993), *cert. denied,* 513 U.S. 873 (1994) ............................ 2

*Delaney v. EPA,*
    898 F.2d 687 (9th Cir. 1990), *cert. denied, Reilly v. Delaney,* 498 U.S. 998 (1990) ................ 23

*Dioxin/Organochlorine Ctr. v. Clarke,*
    57 F.3d 1517 (9th Cir. 1995) .................................................................................. 4

*Friends of Pinto Creek v. EPA,*
    2007 U.S. App. LEXIS 23251 (9th Cir. 2007) ..................................................... 22

*Friends of the Earth v. EPA,*
    446 F.3d 140 (D.C. Cir. 2006) ............................................................................... 4

*Home Builders Ass'n of Nor. California v. United States Dep't of Fish and Wildlife,*
    2007 U.S. Dist. LEXIS 80881 (N.D. Cal. 2007) ................................................. 11

## TABLE OF AUTHORITIES (cont.)

CASES                                                                                          Page

*Massachusetts v. EPA*,
    127 S. Ct. 1438 (2007) ................................................................................ 22

*National Wildlife Fed'n v. Consumers Power Co.*,
    862 F.2d 580 (6th Cir. 1988) ..................................................................... 13

*Natural Resources Defense Council v. EPA*,
    966 F.2d 1292 (9th Cir. 1992) ................................................................23, 24

*Natural Resources Defense Council v. United States Dep't of Interior*,
    113 F.3d 1121 (9th Cir. 1997) ...........................................................11, 18, 23

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*,
    278 F. Supp. 2d 654 (E.D. N.C. 2003)..................................................... 13

*Northwest Envtl. Advocates v. EPA*,
    2005 U.S. Dist. LEXIS 5373 (N.D. Cal. 2005) ...................................... 13

*Occidental Eng'g Co. v. INS*,
    753 F.2d 766 (9th Cir. 1985)..................................................................... 11

*Pronsolino v. Nastri*,
    291 F. 3d 1123 (9th Cir. 2002)...........................................................2, 16, 20

*PUD No. 1 v. Washington Dep't of Ecology*,
    511 U.S. 700, 114 S. Ct. 1900 (1994)...................................................... 4

*S. D. Warren Co. v. Maine Bd. of Envtl. Prot.*,
    547 U.S. 370, 126 S. Ct. 1843 (2006)...................................................... 4

*Safe Air for Everyone v. EPA*,
    488 F.3d 1088 (9th Cir. 2007) ..........................................................12, 16, 23, 24

*Sierra Club v. Hankinson*,
    939 F. Supp. 865 (D. Ga. 1996)...........................................................17, 18

*Sierra Club v. EPA*,
    346 F.3d 955 (9th Cir. 2003)................................................................23, 24

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994)................................................................................. 12

*United States Pub. Interest Research Group v. Heritage Salmon, Inc.*,
    2002 U.S. Dist. LEXIS 2706 (D. Me. 2002).......................................... 13

1

## TABLE OF AUTHORITIES (cont.)

2

FEDERAL STATUTES                                                    Page

3   5 U.S.C. § 706(2) ................................................................................................ 22

4   5 U.S.C. § 706(2)(A) ............................................................................................ 11

5   33 U.S.C. § 1251(a) ............................................................................................... 2

6   33 U.S.C. § 1311(b)(1)(A) ...................................................................................... 2

7   33 U.S.C. § 1311(b)(1)(B) ...................................................................................... 2

8   33 U.S.C. § 1311(b)(2) ........................................................................................... 2

9   33 U.S.C. § 1313 .................................................................................................... 2

10  33 U.S.C. § 1313(b) ............................................................................................... 2

11  33 U.S.C. § 1313(c)(2) ........................................................................................... 3

12  33 U.S.C. § 1313(c)(2)(A) ...................................................................................... 2

13  33 U.S.C. § 1313(c)(3) ........................................................................................... 2

14  33 U.S.C. § 1313(c)(4) ........................................................................................... 2

15  33 U.S.C. § 1313(d)(1) ........................................................................................ 3, 12

16  33 U.S.C. § 1313(d)(1)(A) ................................................................................... 3, 21

17  33 U.S.C. § 1313(d)(1)(C) ............................................................................. 4, 16, 21

18  33 U.S.C. § 1313(d)(2) .................................................................................. 3, 12, 23

19  33 U.S.C. § 1313(e) ............................................................................................... 3

20  33 U.S.C. § 1341 .................................................................................................... 4

21  33 U.S.C. § 1362(3) ............................................................................................... 4

22  33 U.S.C. § 1362(6) .............................................................................................. 13

23  33 U.S.C. § 1362(14) .............................................................................................. 2

24  FEDERAL REGULATIONS

25  40 C.F.R. §§ 130.2(e)-(i) ........................................................................................ 4

26  40 C.F.R. § 130.2(i) ............................................................................................... 4

27  40 C.F.R. § 130.6 ................................................................................................... 3

28  40 C.F.R. § 130.7 ............................................................................................... 3, 21

1

**TABLE OF AUTHORITIES (cont.)**

2  FEDERAL REGULATIONS                                                                      Page

3  40 C.F.R. § 130.7(a) ......................................................................................... 3

4  40 C.F.R. § 130.7(b) ......................................................................................... 3

5  40 C.F.R. § 130.7(b)(1) .................................................................................18, 20

6  40 C.F.R. § 130.7(b)(3) ................................................................................... 17

7  40 C.F.R. § 130.7(b)(4) ............................................................. 3, 12, 13, 15, 17

8  40 C.F.R. § 130.7(c) ....................................................................................... 16

9  40 C.F.R. § 130.7(c)(1) ..................................................................................... 4

10 40 C.F.R § 130.7(c)(1)(ii) .................................................................................. 4

11 40 C.F.R. § 130.7(d) ......................................................................................... 3

12 40 C.F.R. § 130.7(d)(1) ................................................................................... 15

13 40 C.F.R. § 130.7(d)(2) ...............................................................12, 13, 23

14 40 C.F.R. § 131.3(h) ......................................................................................... 3

15 40 C.F.R. § 131.3(i) ......................................................................................... 2

16 FEDERAL REGISTER

17 65 Fed. Reg. 31682 (May 18, 2000) ................................................................. 2

18 EPA GUIDANCE DOCUMENTS

19
   *Guidance for Water Quality-Based Decisions: The TMDL Process*,
20         EPA Office of Water (April 1991) ........................................................ 4

21 *National Clarifying Guidance for 1998 State and Territory Clean Water Act Section 303(d) Listing
   Decisions*,
22         EPA Office of Water (August 17, 1997).......................................... 3, 4

23 *Guidance for 2004 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d) and
   305(b) of the Clean Water Act*,
24         EPA Office of Water (July 21, 2003) .....................................16, 18, 20

25
   *Guidance for 2006 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d),
26   305(b) and 314 of the Clean Water Act*,
27         EPA Office of Water (July 29, 2005) .....................................16, 17, 18

28

1

**TABLE OF AUTHORITIES (cont.)**

2

CALIFORNIA STATUTES                                                                Page

3

Cal. Water Code § 13247 ................................................................................................... 4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3   As required by the Clean Water Act ("CWA"), the State of California has established water

4   quality standards ("WQS") that are designed to ensure that California waters have the water quality

5   needed to be usable for public water contact recreation, for wildlife habitat, for fishing, and other

6   beneficial public uses.  The reaches of the Klamath River that includes the Iron Gate and Copco

7   Reservoirs ("the Reach")[1] fail to meet these WQS due to excessive levels of several pollutants,

8   including the blue-green algae *Microcystis aeruginosa* ("*M. aeruginosa*") and a toxin produced by this

9   algae, microcystin toxin ("the toxin").  *M. aeruginosa* and the toxin are the most serious of these

10   waters' pollutant problems, rendering them unsafe for human water contact recreation and livestock

11   watering, and seriously impairing their wildlife habitat value.  Indeed, levels of *M. aeruginosa* and the

12   toxin occasionally are so high in the Reach that ingestion of water from the Reach could be potentially

13   fatal to children, domestic livestock, or pets.  California and EPA have expressly recognized the

14   dangers posed by the Reach's contamination by *M. aeruginosa* and the toxin and warned the public to

15   stay out of these waters.

16   CWA section 303(d) and EPA regulations require each State every two years to publish a list of

17   all their waters ("303(d) List") not attaining WQS and to identify all the pollutants that are causing

18   these waters not to attain WQS.  EPA must review and amend these 303(d) Lists to correct any

19   oversights or other errors.  Inexplicably and inexcusably, though both the California State Water

20   Resources Control Board ("the State Board"), the State agency responsible for drafting California's

21   303(d) List, and EPA have expressly recognized the dangers posed by *M. aeruginosa* and the toxin's

22   contamination of the Reach, the State Board and EPA have refused to identify *M. aeruginosa* and the

23   toxin as pollutants causing the Reach not to meet applicable WQS.

24   Plaintiff Klamath Riverkeeper ("Riverkeeper")'s members use the Klamath River for recreation,

25   study, aesthetic enjoyment, and spiritual practice.  Their uses of the River, however, are seriously

26

27   [1] The portions of the Klamath River at issue in this lawsuit, which includes the Iron Gate and Copco

28   reservoirs, are referred to in California's 303(d) List as the "Klamath River HU, Middle HA, Oregon to
     Iron Gate," "Klamath River HU, Middle HA, Iron Gate Dam to Scott River," and "Klamath River HU,
     Middle HA, Scott River to Trinity River."  These areas are referred to herein as the "Reach."

1    impaired by contamination of the Reach by *M. aeruginosa* and the toxin. Riverkeeper has made

2    repeated requests to the State Board and EPA that these agencies specify in California's 303(d) List

3    that the Reach is not meeting WQS due to contamination by *M. aeruginosa* and the toxin, as the first

4    step toward the targeted remedial action that would follow under the CWA and other federal and state

5    law from such a listing. Having had these requests ignored, Riverkeeper has brought this action to

6    compel EPA to follow the mandates of the CWA and its own regulations—and to issue a revised

7    303(d) List for California that specifies that the Reach is not meeting WQS due to contamination by *M.*

8    *aeruginosa* and the toxin.

9    **II.     STATUTORY AND REGULATORY BACKGROUND**

10        **A. General CWA and Regulatory Background**

11        Congress passed the CWA "to restore and maintain the chemical, physical, and biological

12    integrity of the Nation's waters." 33 U.S.C. § 1251(a). In enacting the CWA, Congress further

13    proclaimed a national goal that wherever attainable "water quality which provides for the protection of

14    and propagation of fish, shellfish and wildlife and provides for the recreation in and on the water" shall

15    be achieved. *Id.*; *see Am. Paper Institute, Inc. v. EPA*, 890 F.2d 869, 870-71 (7th Cir. 1989). As part

16    of Congress' strategy for meeting these goals, the CWA mandates that EPA develop and impose a

17    national uniform floor of effluent limitations ("technology-based effluent limitations") requiring point

18    sources[2] to reduce the levels of pollutant discharge to that attainable upon the application of the best

19    available pollution reduction technology. 33 U.S.C. § 1311(b)(1)(A), (b)(1)(B), and (b)(2).

20        The CWA further requires all states to develop WQS. 33 U.S.C. § 1313.[3] WQS consist of a

21    waterbody's "designated uses" and "water quality criteria," i.e., the level of water quality needed to

22    ensure attainment of these designated uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.3(i); *see*

23    *generally Pronsolino v. Nastri*, 291 F. 3d 1123, 1127 (9th Cir. 2002).[4] In setting a water's designated

24

25    [2] A point source is any confined, discrete conveyance, such as a discharge pipe. 33 U.S.C. § 1362(14),
     *e.g., Committee to Save Mokelumne River v. East Bay Municipal Utility Dist.*, 13 F.3d 305, 308-309
26    (9th Cir. 1993), *cert. denied*, 513 U.S. 873 (1994).

27    [3] States' revisions to their WQS require EPA approval. 33 U.S.C. § 1313(c)(3). If a state fails to
     develop adequate WQS, EPA must do so instead. 33 U.S.C. § 1313(b), (c)(4).

28    [4] Under California state law, designated uses are referred to as "beneficial uses" and water quality
     criteria as "water quality objectives." *See e.g.*, 65 Fed. Reg. 31682, 31684 (May 18, 2000). For

1   use, a State must take into account the water's "use and value for public water supplies, propagation of

2   fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes . . . ." 33

3   U.S.C. § 1313(c)(2).  Water quality criteria can be expressed as numeric values or as narrative

4   statements about the quality of water needed to attain designated uses.  40 C.F.R. § 131.3(h).

5           CWA section 303(d) and accompanying EPA regulations requires each State every two years to

6   submit a 303(d) List to EPA identifying those waters within its boundaries for which technology-based

7   effluent limitations and other required controls are not stringent enough to achieve the WQS applicable

8   to these waters.  33 U.S.C. § 1313(d)(1); 40 C.F.R. § 130.7(b), (d).  Adoption of a 303(d) List is a part

9   of a State's Continuing Planning Process and adoption of an overall Water Quality Management Plan

10  required by CWA section 303(e) and accompanying EPA regulations.  33 U.S.C. § 1313(e); 40 C.F.R.

11  §§ 130.6, 130.7(a).  A State's 303(d) List must "identify the pollutants causing or expected to cause

12  violations of the applicable water quality standards."  40 C.F.R. § 130.7(b)(4); *see* 33 U.S.C. §

13  1313(d)(1)(A).  The EPA must review and approve a State's 303(d) List.  33 U.S.C. § 1313(d)(2); 40

14  C.F.R. § 130.7(d).  EPA can only approve a State's 303(d) List if EPA finds that it meets the

15  requirements of 40 C.F.R. § 130.7(b), which, as noted, requires, *inter alia*, that the List identify the

16  pollutants causing or expected to cause violations of the applicable WQS.  If EPA disapproves the

17  303(d) List, EPA must issue its own revised 303(d) List.  33 U.S.C. § 1313(d)(2); 40 C.F.R. §

18  130.7(d)(2).  The State must thereafter incorporate EPA's revised 303(d) List into the State's Water

19  Quality Management Plan.  40 C.F.R. § 130.7(d)(2).

20          In determining whether to place a water on its 303(d) List, a State and ultimately EPA must list

21  any water not attaining any WQS applicable to that water - including both numeric and narrative WQS

22  and regardless of whether the cause for the water not attaining WQS is from point source discharges,

23  non-point sources that are human in origin, or natural causes.  *See* 40 C.F.R. § 130.7(b); R. 59[5]

24  (available at http://www.epa.gov/owow/tmdl/lisgid.html) (*National Clarifying Guidance for 1998 State*

---

26  simplicity, the CWA's statutory terms rather than the State of California's terminology will generally
    be used herein.

27  [5] Citations to pages of EPA's Administrative Record are referred to herein as "R. [page]."  All pages in

28  the record cited to herein are provided for the Court as Exhibit A to the Declaration of Drevet Hunt in
    Support of Plaintiff's Motion for Summary Judgment  ("Hunt Decl.").

1    *and Territory Clean Water Act Section 303(d) Listing Decisions*, EPA Office of Water, August 17,

2    1997) ("1998 Guidance") (discussing the requirement to list heat as a pollutant causing an impairment

3    and noting "[i]t is immaterial to the [CWA § 303(d)] listing decision whether the source of the

4    temperature-related impairment is a thermal discharge or solar radiation. Both are sources of heat, and

5    the heat can be allocated through the TMDL process.").

6          For every impaired water on its 303(d) List, the State must establish a total maximum daily

7    load ("TMDL") for each pollutant that is causing the water not to meet its applicable WQS. 33 U.S.C.

8    § 1313(d)(1)(C); 40 C.F.R § 130.7(c)(1)(ii). The TMDL is the maximum daily load of a particular

9    pollutant that a water can withstand while still achieving its applicable WQS. 33 U.S.C. § 1362(3); 40

10    C.F.R. § 130.2(i); *Friends of the Earth v. EPA*, 446 F.3d 140, 143 (D.C. Cir. 2006). A TMDL must

11    identify the sources of the pollutant(s) causing the impairment and allocate the permissible loading of

12    the pollutant from all sources, including point sources, non-point sources, and natural sources. 40

13    C.F.R. §§ 130.2(e)-(i) and 130.7(c)(1); *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1520 (9th

14    Cir. 1995); R. 1458 (*Guidance for Water Quality-Based Decisions: The TMDL Process*, EPA Office of

15    Water, April 1991).

16          CWA section 401 further mandates that federal licenses cannot be issued for any activity that

17    may result in a discharge to waters without a certification from the applicable State that the activity will

18    not interfere with attainment of that State's WQS. 33 U.S.C. § 1341. A State may impose conditions

19    on the project requiring the federal license to ensure WQS are met. *Id.*; *S. D. Warren Co. v. Maine Bd.*

20    *of Envtl. Prot.*, 547 U.S. 370, n1, 126 S. Ct. 1843 (2006); *PUD No. 1 v. Washington Dep't of Ecology*,

21    511 U.S. 700, 713, 114 S. Ct. 1900 (1994).

22    **B. State WQS**

23          Applicable WQS for the Reach, duly adopted by the North Coast Regional Water Quality

24    Control Board ("Regional Board") and approved by the State Board and EPA, are set forth in the

25    Regional Board's Water Quality Control Plan for the North Coast Region ("the Basin Plan").[6] The

26

27    [6] Relevant portions of the Basin Plan are provided for the Court's convenience as Exhibit B to the Hunt

28    Decl. (also available at http://www.waterboards.ca.gov/northcoast/programs/basinplan/bpdocs.html).
       The Basin Plan is state law and certain elements of it, once approved by EPA, are federal law. Cal.
       Water Code § 13247; *see Arkansas v. Oklahoma*, 503 U.S. 91, 110, 112 S. Ct. 1046 (1992).

Basin Plan specifies the following designated uses for the Reach:  Native American cultural use, water contact recreation, non-contact water recreation, commercial and sportfishing, warm freshwater habitat, cold freshwater habitat, wildlife habitat; habitat for rare, threatened, or endangered species; migration of aquatic organisms; aquatic life spawning, reproduction, or early development; and potential municipal and domestic water supply, and agricultural supply.  Basin Plan at 2-6.00.

The Basin Plan further, *inter alia*, sets forth narrative water quality criteria for water body toxicity, color, floating material, suspended material, biostimulatory substances, and tastes and odors. *Id.* at 3-3.00-5.00.  Specifically, the Basin Plan includes the following narrative water quality criteria: (1) for toxicity: "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life," *id.* at 3-4.00, (2) for color: "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses," *id.* at 3-3.00; (3) for floating material: "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses," *id*; (4) for suspended material:  "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses," *id*; (5) for biostimulatory substances: "[w]aters shall not contain biostimulatory substances in concentrations that promote aquatic growths to the extent that such growths cause nuisance or adversely affect beneficial uses," *id*; and (6) for tastes and odors:  "[w]aters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible products of aquatic origin, or that cause nuisance or adversely affect beneficial uses," *id*.

## III.    FACTS

### A. The Reach's Impairment by *M. aeruginosa* and the Toxin

The Klamath River flows from Central Oregon, into Northern California, splits the Trinity Alps and the Marble Mountains, and reaches the Pacific at the Redwood Coast.  R. 1163.  The Klamath River is the cultural centerpiece for several Native American tribes, including the Karuk and Yurok Tribes, who depend on the river for subsistence and worship in its waters each year for spiritual renewal.  R. 137-45.  Beyond its immense cultural importance, the Klamath River is the third most significant river on the Pacific Coast for salmon habitat.  R. 983.  The Klamath's flows also support

1  agriculture in the valleys and high desert plateaus of south-central Oregon and Northern California.

2      The Klamath River is seriously imperiled by environmental degradation.  R. 1050-51.  The

3  reach of the River at issue in this case suffers from algal blooms, excessively warm water temperatures,

4  low dissolved oxygen levels, high pH, and inadequate flow.  R. 93-96; 1009-11.  The most significant

5  of these environmental problems is the Reach's repeated algal blooms.  R. 1014-15.  Algal blooms

6  generally occur in stagnant, warm waters that are elevated in nutrients.  R. 44.  The Iron Gate and

7  Copco Dams ("the Dams"), by halting the River's flow and creating large stagnant reservoirs, create

8  the conditions that allow for algal blooms in the Reach.  R. 666, 1014-15.  The water behind the Dams

9  becomes excessively warm compared to free flowing water by being held stagnant in unshaded

10  reservoirs (in natural conditions, riparian vegetation canopy would shade and keep cool free flowing

11  river waters).  R. 1016-17.  The Klamath River is naturally high in the nutrient phosphorous.  R. 984,

12  1213.  Nutrient runoff from agricultural activity has further added to this naturally elevated nutrient

13  level in the Reach.  R. 985.  In part, the algal blooms are a self-enhancing problem.  R. 1211.  The

14  blooms are comprised of many species of algae, some of which are nitrogen-fixing, i.e., are capable of

15  uptaking atmospheric nitrogen as a nutrient for the plant, thus further adding to the nutrient loading in

16  the Reach.  R. 1098-99, 1187-90, 1213.  When these aquatic organisms die back, they leave the

17  nitrogen they fixed from the atmosphere in the water column as fertilizer for a new generation of algae,

18  including those species that cannot themselves fix nitrogen, feeding a spiraling problem of yet more

19  aggressive algae blooms.  R. 1098-99, 1211.

20      The installation of the Dams within the Reach is the key causative factor for the algae blooms.

21  R. 1014-15, 1216.  Without the Dams, the Reach would still have elevated levels of nutrients and

22  perhaps have somewhat elevated temperature as a result of upstream flow modifications (though if the

23  River were allowed to flow, temperatures would not be as high as in the stagnant reservoirs), but algae

24  blooms simply would not occur in a free-flowing river—the stagnant reservoir waters created by the

25  Dams is a necessary condition for the blooms.  *Id*.

26      The most harmful of the species in the Reach's algal blooms is *M. aeruginosa*, commonly

27  referred to as blue green algae, a species of cyanobacteria.  R. 882.  Many genera of cyanobacteria

28  produce a variety of neuorotoxins, liver toxins (hepatotoxins) and other toxins poisonous to both

1    humans and wildlife.  R. 882-83.  While an algae cell remains healthy, toxins generally remain within

2    the cell.  R. 629-30.  However, under certain growth conditions, healthy algal cells secrete toxins.  R.

3    630.  As the algal cells age, die or break open, including for example when algaecides are applied, the

4    cells release their toxins into the water.  *Id*.

5          *M. aeruginosa* is found on and near the surface of relatively still lakes and reservoirs, appearing

6    as mats of scum and giving the water a green-hue.  This blue-green algae produces the potent toxin

7    microcystin.  R. 882-83, 1012-13.  Microcystin is a hepatotoxin, the liver being its ultimate target.  *Id.*

8    Microcystins are highly toxic at very low dosages.  *Id.*  Exposure to *M. aeruginosa* and microcystin

9    occurs through oral ingestion, aspiration of water into the lungs, inhalation of mist and skin contact.  R.

10   884-85.  Microcystin can accumulate in shellfish and fish tissue.  *Id*.  Microcystin has been measured

11   not only in the livers and viscera of exposed fish, but also their fillets.  *Id*.  Cooking fish or heating

12   water does not break down microcystins.  *Id*.  Because the death of the *M. aeruginosa* releases its

13   toxins into the surrounding waters, released toxins will persist after a blue-green algae bloom

14   dissipates.  R. 887.  Exposure to the toxin can be exacerbated by eager recreational users entering the

15   water shortly after a bloom has dissipated.  *Id*.  Exposure can result in serious gastrointestinal

16   problems, nausea, vomiting, flu-like symptoms, sore throat, blistering, eye and ear irritations, rashes,

17   visual disturbances and death through liver failure.  R. 882.

18         That the Reach is contaminated to dangerous levels by *M. aeruginosa* and the toxin is not

19   controversial.  Joint Status Report at 4:13-15 (Docket #26); Answer ¶ 29 (Docket #15); R. 955-80, 981-

20   1005, 1006-61, 1062-1100, 1101-15, 1116-50, 1151-61, 1162-1220, 1221-22, 1223.  In its public

21   comment Responsiveness Summary included as an enclosure to its letter stating its final decision on the

22   2004-2006 iteration of California's 303(d) List ("2006 303(d) List"), EPA expressly noted, "EPA and

23   California recognize the public health and environmental impacts associated with *Microcystis*

24   *aeruginosa* (blue green algae and associated toxins) in the Klamath River and Iron Gate and Copco

25   Dam reservoirs."  R. 43.  For example, the cell counts of *M. aeruginosa* and concentration levels of the

26   toxin in the Iron Gate and Copco Reservoirs in 2005 exceeded by 1,630 and 99.7 times, respectively,

27   the levels established by the California Department of Health Services ("DHS") and the World Health

28   Organization ("WHO") as presenting a moderate risk to health.  R. 1122-24.  In 2006, the *M.*

*aeruginosa* cell counts observed were up to 3,934 times greater than the moderate health risk levels, R. 1106-08, and the levels of the toxin observed in the Reservoirs were hundreds of times greater than the tolerable daily intake levels for a 40 pound child, R. 1106, and were "among the highest recorded in the world." R. 1105.

In recent years, EPA, the State Board, and the Regional Board have issued public health advisories cautioning the public about the "dangerous Klamath River algae." R. 1146. In 2005, the Regional Board's Executive Officer stated "the levels of algae and associated toxins measured in parts of the river are high enough to pose health risks to anyone drinking or bathing in the water, particularly children and animals." R. 1147. To protect the public from the threats posed by the algae and toxin in the Reach, the Regional Board has posted signs proclaiming:

> Avoid Water Contact in Iron Gate and Copco Reservoirs Due to high levels of blue-green algae that can produce harmful toxins. Do not use this water for drinking or cooking. Do not consume fish livers or digestive organs, and wash fillets with drinking water. Children and pets are at greatest risk.

R. 653.

Information provided by recreational and subsistence users of the Reach also indicate that these waters are significantly impaired. For example, in a survey, recreational users of the Reach complained of excessive algae, green water, foam, suds, and bad odors, with comments including "slimy, green, foamy – yuck." R. 1043, 1194 ("of those persons who felt that water quality detracted from their visit [to the Reach], the most commonly cited factor was algae or aquatic plants (respondents mentioned 'algae, green stuff, muck, seaweed, moss, slime') and the attendant odor."). Moreover, local fisherman describe the bad taste and odor of fish caught in or near the Reach as follows:

> Around here, when people say that they got salmon, the first question that you ask is where did you get it from? If they got it up river [closer to the Iron Gate dam], you don't want to eat it. People that don't know eat it. But people that know get it farther down.

R. 1043 (Quartz Valley Indian Reservation staff statement).

*M. aeruginosa* and the toxin also impair Native American cultural uses of the Reach. In particular, as the Regional Board recently found, members of the Karuk Tribe engaged in "traditional 'whole body immersion' ceremonies in 'traditional locations and at traditional timeframes'" have

experienced skin rashes and gastrointestinal upsets that they attribute to their exposure to *M. aeruginosa* and the toxin. R. 669.

Statements and findings of the State Board and Regional Board further indicate the significant impairment of the Reach caused by *M. aeruginosa* and the toxin. The State Board commented in a recent letter, "we recognize that the Klamath River has experienced impairments in various beneficial uses due to recurring blue-green algal blooms." R. 623. Likewise, the Regional Board has acknowledged that evidence of the impairment of the Reach includes:

- the exceedance of DHS and WHO guidelines (for algae and the toxin);
- visible and extensive algal mats;
- recreational water users' avoidance of swimming, wading, water-skiing, and fishing in areas of the reservoirs with excess blue-green algae blooms.

R. 669.

Pacificorp, Inc. ("Pacificorp") operates several dams along the Klamath River to generate power, including the Iron Gate and Copco Dams. R. 666. Currently Pacificorp is seeking relicensing of the Dams from the Federal Regulatory Energy Commission ("FERC"). R. 981. As part of this relicensing, FERC must fully consider the environmental impacts of the Dams, including their contribution to Klamath River algal blooms and the River's failure to attain WQS. R. 1009-11, 1164-1220 (portion of the Draft Environmental Impact Statement for the FERC relicensing focused on water quality issues). As noted in the Statutory Background discussion above, FERC cannot re-issue licenses to the Dams without certification from the State Board pursuant to CWA section 401 that the Dams are not preventing the attainment of state WQS. Notably, the State Board recently commented with respect to this CWA section 401 water quality certification that the State Board "may not be able to issue a [Clean Water Act section 401 water quality certification] for this project until the project's contribution to the 303(d) listing is fully understood." R. 1003.

To ensure that the State Board has fully developed and considered all the information that it needs to make a proper CWA section 401 certification decision for the Dams, Riverkeeper is pressing EPA and the State Board to ensure that a complete California 303(d) List has been adopted which identifies *M. aeruginosa* and the toxin as pollutants causing the Reach to not be attaining WQS. Such a complete List, in Riverkeeper's view, is an important step toward EPA and the State Board recognizing

that the Dams are the ultimate causative source of *M. aeruginosa* and the toxin impairment in the

Klamath River—which the State Board will then duly take into account in deciding whether to issue

the Dams CWA section 401 water quality certification – and if so, whether to add environmentally

protective conditions to the certification required before FERC could relicense the Dams.

**B. State Board and EPA Action on the California 303(d) List**

The State Board first placed the Klamath River on California's 303(d) List in 1993, identifying

excessively warm water temperatures and excessive nutrient levels as the pollutants/water quality

problems causing the River to fail to meet WQS. R. 89-90. Despite its placement on the 303(d) List in

1993, the Klamath River remains impaired today by algal blooms, excessively warm temperatures,

high nutrients, low dissolved oxygen levels, excessive sediment/siltation, high pH, and inadequate

flows due to agricultural diversions. R. 89-97.

During the public comment periods on the Regional Board's and State Board's consideration of

the 2006 303(d) List, Riverkeeper commented to both agencies that the Reach should be added to the

List as an impaired water and that *M. aeruginosa* and the toxin should be identified as pollutants

causing the failure of these waters to meet applicable WQS. R. 128-48, 275-76, 605-06. The Regional

Board and State Board did not heed Riverkeeper's comments and the State Board adopted a final State

2006 303(d) List that did not identify *M. aeruginosa* and the toxin as pollutants causing the Reach to

fail to attain WQS. R. 46, 435.

The State Board submitted the State's final 2006 303(d) List to EPA Region 9 for approval in

November 2006. R. 1. In a letter to the State Board dated November 30, 2006, the EPA partially

approved the State's inclusion of all waters and pollutants identified in the State's 2006 303(d) List. R.

1-2. By letter on March 8, 2007, the EPA partially disapproved the 2006 303(d) List due to omission

of several water bodies and associated pollutants that failed to meet federal listing requirements. R. 10.

In this letter, EPA indicated it was still considering its final approval of the 2006 303(d) List and that it

would accept public comments on EPA's further action. *Id.* Riverkeeper wrote a comment letter to

EPA on April 13, 2007 contending that the Reach is failing to attain the Basin Plan's designated uses

and narrative water quality criteria due to the presence of *M. aeruginosa* and the toxin in the Reach and

urging EPA to issue a revised 2006 303(d) List that identified these pollutants as among those causing

1  the Reach not to meet applicable WQS.  R. 57-67.

2         In a letter dated June 28, 2007 ("EPA June 2007 Letter") to the State Board, the EPA issued its

3  final approval of the 2006 303(d) List.  R. 35.  In its final approval, EPA followed the Regional Board

4  and State Board's lead and again failed to identify *M. aeruginosa* and the toxin as pollutants causing

5  the Reach to violate applicable WQS. R. 43-47.  In its Responsiveness Summary accompanying the

6  EPA June 2007 Letter, EPA expressly recognized that the presence of *M. aeruginosa* and the toxin in

7  the Reach poses adverse public health and environmental risks.  R. 43, 47.  EPA did not, however,

8  explain why or how the *M. aeruginosa* and the toxin could pose such health and environmental risks

9  and yet not constitute pollutants that cause the Reach to fail to meet applicable WQS.  *See* R. 43-47.

10  Instead, EPA stated that "EPA's approval of California's determination not to add to its list of

11  pollutants impairing the Klamath River, and the Iron Gate and Copco Reservoirs, should not be

12  construed as a suggestion by EPA that the public health and environmental impacts associated with

13  blue green algae or *Microsystis aeruginosa* in the Klamath River are trivial or need not be addressed."

14  R. 47.

15  **IV.     STANDARD OF REVIEW**

16         Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment when "there

17  is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."

18  "When reviewing an administrative action, 'there are no disputed facts that the district court must

19  resolve.'"  *Home Builders Ass'n of Nor. California v. United States Dep't of Fish and Wildlife*, 2007

20  U.S. Dist. LEXIS 80881, *10 (N.D. Cal. 2007) (Alsup, J.) (quoting *Occidental Eng'g Co. v. INS*, 753

21  F.2d 766, 769 (9th Cir. 1985)).  Accordingly, summary adjudication is proper to resolve whether, based

22  on the record before it, EPA's approval of the 2006 303(d) List was arbitrary, capricious, an abuse of

23  discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2)(A) ("APA").  Under the

24  APA, a court "may not substitute its judgment for that of the agency" but must "consider whether the

25  decision was based on a consideration of the relevant factors and whether there has been a clear error

26  of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S. Ct. 814 (1971).

27  An agency abuses its discretion when it fails to consider the requirements imposed by its own

28  regulations or acts not in accord with those requirements. *See Natural Resources Defense Council v.*

1  *United States Dep't of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997); *see also Am. Canoe Ass'n v. EPA*,

2  30 F. Supp. 2d 908, 919 (D. Va. 1998).

3          In construing an agency's regulations, if a regulation has a plain meaning on its face, a court

4  should look no further than the facial language of the regulation and heed that language's plain

5  meaning. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1097-98 (9th Cir. 2007). If a regulation is

6  facially ambiguous, deference to an agency's interpretation of its own regulations is appropriate

7  "unless 'an alternative reading is compelled … by other indications of the [agency's] intent at the time

8  of the regulation's promulgation.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

9  However, a court owes no deference to an agency's *post hoc* litigation positions. *Safe Air*, 488 F.3d at

10  1099; *see also Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213 (1988) (finding that "deference

11  to … an agency's convenient litigating position would be entirely inappropriate").

## V.     ARGUMENT

### A. EPA's Failure To Identify in California's 303(d) List *M. aeruginosa* and Microsystin Toxin as Pollutants Impairing the Klamath River Was Erroneous

15          CWA section 303(d) and EPA regulations require the States to specify in their 303(d) Lists all

16  pollutants that are causing exceedances of WQS for a listed water. 33 U.S.C. § 1313(d)(1); 40 C.F.R. §

17  130.7(b)(4). EPA must review and approve a State's 303(d) List, and in the process, correct any

18  deficiencies in a State's 303(d) List. 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(b)(4). *M. aeruginosa*

19  and the toxin are pollutants causing the Reach not to meet applicable WQS. Accordingly, CWA

20  section 303(d) and EPA regulations required the State Board in the 2006 303(d) List to include *M.*

21  *aeruginosa* and the toxin as among the pollutants causing the Reach not to meet applicable WQS.

22  CWA section 303(d) and EPA regulations further required EPA not to approve the State Board's

23  submitted 2006 303(d) List given the List's failure to include these pollutants and to instead adopt an

24  EPA-revised 2006 303(d) List that included *M. aeruginosa* and the toxin as among the pollutants

25  causing the Reach not to meet applicable WQS. 40 C.F.R. § 130.7(d)(2); 33 U.S.C. § 1313(d)(2).

26  EPA's erroneous approval of the 2006 303(d) List must be set aside under the APA as arbitrary,

27  capricious, an abuse of discretion, and otherwise not in accordance with the law. The Court should

28  further require EPA to adopt a new 2006 303(d) List within sixty days that comports with CWA section

303(d) and EPA regulations.

### 1. *M. aeruginosa* and The Toxin Are Pollutants

As noted, EPA regulations require a 303(d) List to identify the "pollutants" causing or expected to cause violations of WQS. 40 C.F.R. §§ 130.7(b)(4) and (d)(2). *M. aeruginosa* and the toxin are pollutants within the meaning of the CWA and this EPA regulation. The CWA, *inter alia*, defines "pollutant" to include "biological materials." 33 U.S.C. § 1362(6). *M. aeruginosa* and the toxin are biological materials; one is a form of bacteria, the other is a toxin released from this bacteria when its cells lyse. R. 629-30, 882-83. As biological materials, the algae and the toxin are "pollutants" under the CWA. *See National Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 583 (6th Cir. 1988) (live fish, dead fish and fish remains are biological materials, thus CWA pollutants); *Northwest Envtl. Advocates v. EPA*, 2005 U.S. Dist. LEXIS 5373, *27-*28 (N.D. Cal. 2005) (fish and other forms of aquatic life are biological materials, thus CWA pollutants); *United States Pub. Interest Research Group v. Heritage Salmon, Inc.*, 2002 U.S. Dist. LEXIS 2706, *22-*35 (D. Me. 2002) (salmon, salmon feces, and salmon urine are biological materials and thus pollutants); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 677 (E.D. N.C. 2003) (fecal coliform bacteria is a biological material and thus a CWA pollutant).[7]

### 2. *M. aeruginosa* and the Toxin Are Causing the Klamath River Not to Meet WQS

*M. aeruginosa* and the toxin are causing the Reach not to meet the designated uses and narrative water quality criteria in the Basin Plan which collectively constitute applicable WQS for the Reach. Indeed, the Regional Board, State Board and EPA have expressly recognized as much. On April 26, 2007, the Regional Board adopted a resolution expressly finding that:

> Copco and Iron Gate Reservoirs are currently out of conformance with a number of Basin Plan water quality objectives [narrative water quality criteria]. Water within and discharged from the reservoirs routinely exceed the following water quality objectives during summer months:

---

[7] The State Board, with EPA's approval, identified algae as among the pollutants impairing 21 other waterbodies on the 2006 303(d) List—signaling implicit EPA agreement that algae is a pollutant under the CWA and EPA's 303(d) List regulations. Hunt Decl., Exhibit C (also available at http://www.swrcb.ca.gov/tmdl/303d_lists2006approved.html). Moreover, there are 69 EPA-approved TMDLs nationwide for "algal growth," further underscoring that EPA has repeatedly viewed algae growth in waters to be a "pollutant" within the meaning of CWA § 303(d) and accompanying regulations. *See* R. 76.

Taste and Odor; Floating Materials; Biostimulatory Substances; pH; Dissolved oxygen; Toxicity. . . .

Evidence that beneficial [designated] uses of water in and downstream of Copco and Iron Gate Reservoirs are being adversely affected by blue-green algae include:

- the exceedance of DHS and WHO guidelines (for algae and the toxin);
- visible and extensive algal mats;
- recreational water users' avoidance of swimming, wading, water-skiing, and fishing in areas of the reservoirs with excess blue-green algae blooms;
- the Karuk tribe has offered anecdotal evidence that during traditional "whole body immersion" ceremonies in "traditional locations and at traditional timeframes," participants experienced skin rashes and gastrointestinal upsets. They believe it is from exposure to blue-green algae toxins.

Likewise, in a letter dated March 23, 2007, the State Board "recognize[d] that the Klamath River has experienced impairments in various beneficial [designated] uses due to recurring blue-green algal blooms." R. 623. As noted, EPA's public comments Responsiveness Summary accompanying its final approval of the 2006 303(d) List "recognize[d] the public health and environmental impacts associated with *M. aeruginosa* (blue green algae and its associated toxins) in the Klamath River and Iron Gate and Copco reservoirs … ." R. 43.

The Administrative Record accompanying EPA's final approval of the 2006 303(d) List contains ample additional evidence that the presence of *M. aeruginosa* and the toxin is causing the Reach not to meet the Basin Plan's designated uses and narrative water quality criteria. As noted in the Statutory and Regulatory Background discussion above, these designated uses include: Native American cultural use; water contact recreation; non-contact water recreation; commercial and sportfishing; warm freshwater habitat; cold freshwater habitat, wildlife habitat; habitat for rare, threatened, or endangered species; migration of aquatic organisms; aquatic life spawning, reproduction, or early development; and potential municipal and domestic water supply, and agricultural supply. Basin Plan at 2-6.00. The Basin Plan further, *inter alia*, sets forth narrative water quality criteria for water body toxicity, color, floating material, suspended material, biostimulatory substances, and tastes and odors. *Id*. at 3-3.00-5.00. As explained above in the Facts discussion, the levels of *M. aeruginosa* and the toxin in the Reach have exceeded DHS and WHO health risk standards for water contact or water ingestion by huge margins, thus prompting EPA, the State Board, and the Regional Board to issue public warnings not to contact or ingest water from the Reach. R. 1122-24, 1223. The Reach's waters being unsafe to swim in or drink means they are failing to attain their designated use for Native

American cultural use, water contact recreation, and potential municipal and domestic water supply. The waters are further not meeting Basin Plan narrative water quality criteria specifying that  "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human[s] . . . ,"  and further specifying that waters shall not contain floating or suspended material that cause nuisance or adversely affect beneficial uses, or biostimulatory substances that promote aquatic growths that cause nuisance or adversely affect beneficial uses.  Basin Plan at 3-3.00-4.00.

The Administrative Record also well documents that recreational and tribal users of the Reach have complained repeatedly about the unsightly, unpleasant and foul-smelling floating algal blooms and the bad taste and odor of fish caught in or near the Reach due to the algal blooms.  R. 1043, 1194. These impacts to the Reach's aesthetics interfere with the designated use of the Reach for Native American cultural use, water contact recreation, non-contact water recreation, and commercial and sportfishing.  These impacts also cause violations of the Basin Plan's narrative water quality criteria specifying that waters be free of:  coloration or floating or solid material that causes nuisance or adversely affects beneficial uses, biostimulatory substances that promote aquatic growths that cause nuisance or adversely affect beneficial uses, and taste or odor-producing substances that impart undesirable tastes or odors to fish, or that cause nuisance or adversely affect beneficial uses.

There is no evidence in the Administrative Record contradicting that the presence of *M. aeruginosa* and the toxin in the Reach is causing the Reach to fail to meet applicable WQS and no basis for EPA to contest this conclusion.

### 3.  The State and EPA Must Include All Pollutants Causing Violations of WQS on the 2006 303(d) List

As noted, the State Board issued and EPA has approved a 2006 303(d) List that includes the Reach and identifies some of the pollutants causing the Reach to not meet applicable WQS, but EPA's approval is contrary to law because a 303(d) List must include *all* the pollutants causing a water to fail to attain WQS.  EPA regulations mandate that a 303(d) list "shall identify *the pollutants* causing or expected to cause violations of applicable water quality standards."  40 C.F.R. § 130.7(b)(4) (emphasis added); s*ee also* 40 C.F.R. § 130.7(d)(1).  This regulation does not state that a 303(d) list can identify

1    *some* of the pollutants causing WQS not to be met.  Instead, 40 C.F.R. 130.7(b)(4)'s command – the

2    list "shall identify the pollutants" – is stated in absolute, unqualified terms.  As such, the plain meaning

3    of the EPA regulation is that if a pollutant causes or is expected to cause a violation of WQS, a 303(d)

4    List must identify it.  *Safe Air*, 488 F.3d at 1097-98 ("the plain meaning of a regulation governs.").

5           If the Court were to look beyond 40 C.F.R. § 130.7(b)(4)'s plain meaning, EPA's own guidance

6    documents indicate that EPA has also consistently interpreted its regulation to mandate that *all*

7    *pollutants* causing or expected to cause a water not to meet WQS must be identified in a 303(d) List.

8    Recent EPA guidance documents unequivocally declare that "States must identify *all pollutants* that

9    are known to be causing the impairment of a segment."  R. 1351 (*Guidance for 2006 Assessment,*

10   *Listing and Reporting Requirements Pursuant to Sections 303(d), 305(b) and 314 of the Clean Water*

11   *Act*, EPA Office of Water, at 63 (July 29, 2005) ("2006 Guidance") (emphasis added); R. 1394

12   (*Guidance for 2004 Assessment, Listing and Reporting Requirements Pursuant to Sections 303(d) and*

13   *305(b) of the Clean Water Act*, EPA Office of Water, at 13 (July 21, 2003) ("2004 Guidance") (same);

14   1998 Guidance (stating that 40 C.F.R. § 130.7(b)(4) requires the States, and thus EPA, to "identify

15   whether the waterbody is impaired for one *or more* pollutants") (emphasis added).

16          Requiring 303(d) Lists to identify all pollutants causing a water not to meet WQS is logically

17   consistent with one of the central purposes of these Lists:  to create a target list for the development of

18   TMDLs.  *See* 33 U.S.C. § 1313(d)(1)(C); 40 C.F.R. § 130.7(c) (requiring the development of TMDLs

19   for the pollutants set forth in a 303(d) List).  TMDLs are pollutant-specific, i.e., CWA section 303(d)

20   requires the States and EPA to adopt TMDLs that set the maximum allowable daily load of a particular,

21   identified pollutant that is causing a water not to meet WQS as the strategy for curing the water

22   pollution problem posed by *that pollutant*.  33 U.S.C. § 1313(d)(1)(C); *Pronsolino*, 291 F.3d at 1140

23   (Congress "definitively required" TMDL development for each pollutant causing a water not to attain

24   WQS).  If a State and EPA leave a particular pollutant that is causing a water not to meet WQS off of a

25   303(d) List, then the State and EPA are necessarily deciding not to target that pollutant for a TMDL

26   and thwarting Congressional intent that TMDLs be developed to rid waters of *all* the pollutants that are

27   causing them to fail to meet WQS.  *See id.*  Indeed, in prior contexts, EPA guidance has recognized that

28   the CWA's TMDL regime is meant to have the States and EPA address *each* of the pollutants that are

1  impairing any given water. R. 1390 (2004 Guidance) ("Where more than one pollutant is causing the

2  impairment, the water should remain in category 5 [i.e., on the 303(d) List,] until all pollutants are

3  addressed in a completed/EPA-approved TMDL . . . .").

4      Moreover, any pollutant causing or expected to cause the Reach to violate *any* WQS, including

5  designated uses and narrative water quality criteria, must be included on the 2006 303(d) List. EPA

6  regulations command that "for purposes of listing waters under [CWA § 303(d) and 40 C.F.R. §]

7  130.7(b), the term 'applicable water quality standards' refer to those water quality standards established

8  under section 303 of the Act, including numeric criteria, *narrative criteria*, *waterbody uses*, and

9  antidegradation requirements." 40 C.F.R. § 130.7(b)(3) (emphasis added). Under these regulations'

10  plain meaning, if a pollutant is causing the violation of designated uses and narrative water quality

11  criteria included in WQS, it must be identified in a 303(d) List. *See Sierra Club v. Hankinson*, 939 F.

12  Supp. 865, 870 (D. Ga. 1996); *Am. Littoral Soc'y v. EPA,* 199 F. Supp. 2d 217, 238 (D. N.J. 2002)

13  (303(d) Lists must include waters failing to meet non-numeric aspects of WQS, such as antidegradation

14  standards). EPA guidance indicates that EPA agrees with this plain meaning. R. 1349 (2006

15  Guidance) ("When deciding whether to identify a segment as impaired [on their 303(d) Lists], states

16  need to determine whether there are impairments of designated uses and narrative criteria, as well as

17  the numeric criteria.").

18      In sum, in accord with the plain meaning of 40 C.F.R. § 130.7(b)(4) and EPA guidance

19  interpreting that regulation, EPA must ensure that the 2006 303(d) List identify *all* pollutants causing

20  or expected to cause the Reach to violate *any* WQS—including *M. aeruginosa* and the toxin given that

21  they are causing and must be expected to cause the Reach not to meet designated uses and narrative

22  water quality criteria in the Basin Plan, which are applicable WQS.

### 4.  EPA Erroneously Relied on Improper Factors and Failed to Consider Relevant Factors in Approving the 2006 303(d) List

25      As noted, pursuant to 40 C.F.R. § 130.7(b)(4), a State in adopting and EPA in reviewing and

26  approving a 303(d) List face a relatively straight-forward task:  to determine whether a water is

27  meeting applicable WQS and if not, to identify all the pollutants causing the water not to meet

28  applicable WQS. Remarkably, however, in approving the 2006 303(d) List, EPA expressly admitted

that it had failed to determine either whether *M. aeruginosa* is a pollutant or whether there may be applicable WQS related to the presence of *M. aeruginosa* in the Reach. After noting that Riverkeeper and others had objected to the State Board's declining to include *M. aeruginosa* in the 303(d) List due to the State Board's erroneous conclusions that there are no WQS applicable to *M. aeruginosa* and that the algae is not a pollutant, EPA observed:

> EPA did not rely on these factors in determining that the State's decision was reasonable. EPA is not taking a position at this time on whether blue green algae may be considered a "pollutant" or whether there may be applicable state water quality standards related to the presence of blue green algae.

R. 46. EPA further noted that, in effect, it would remain open to reconsideration of this listing decision after the State Board and other entities further studied whether *M. aeruginosa* should be included on California's 303(d) List. *Id.* EPA made clear, however, that its decision not to add *M. aeruginosa* and the toxin to the 2006 303(d) List was not due to EPA factual or scientific uncertainty about the environmental degradation or risks posed by *M. aeruginosa* and the toxin:

> EPA's approval of California's determination not to add to its list of pollutants impairing the Klamath River, and the Iron Gate and Copco Dam reservoirs, should not be construed as a suggestion by EPA that the public health and environmental impacts associated with blue green algae or *M. aeruginosa* in the Klamath River are trivial or need not be addressed.

*Id.* Instead, as noted, EPA expressly indicated that it "recognize[s] the public health and environmental impacts associated with *M. aeruginosa* (blue green algae and associated toxins) in the Klamath River and Iron Gate and Copco Dam reservoirs." *Id.*

EPA's failure to determine whether *M. aeruginosa* and the toxin are pollutants and whether there are applicable WQS sufficiently related to these pollutants such that these pollutants could be found to be causing the Reach to fail to meet WQS plainly constitutes agency failure to consider essential aspects of a problem, rendering EPA's action arbitrary and capricious under the APA. *NRDC v. DOI*, 113 F.3d at 1124 (agency must base its decision on consideration of relevant factors). The core of the 303(d) List approval task faced by EPA was to answer the very questions that EPA expressly declined to resolve.

Instead of determining whether *M. aeruginosa* and the toxin are pollutants and whether they are causing the Reach not to meet applicable WQS, EPA decided it could, at least for now, decide not to

include *M. aeruginosa* and the toxin on the 2006 303(d) List based on EPA's vague consideration of "other actions being taken to address concerns resulting from" *M. aeruginosa* and the toxin.  R. 46. EPA's decision, however was improper in several respects.

EPA regulations mandate that a State's 303(d) List must identify all waters for which effluent limitations or other pollution control measures "required by" the CWA, local, State, or other federal law are not stringent enough to ensure attainment of any applicable WQS.[8]  40 C.F.R. § 130.7(b)(1).  In other words, unless the CWA, local, State or other federal law imposes mandatory requirements that will assure that WQS are attained, a water body (and the pollutants causing the water's impairment) *must* be included on a State's 303(d) list.  *See Sierra Club*, 939 F. Supp. at 870 (noting that it was unclear whether Georgia "made any showing to EPA that the individual control strategies used to justify the exclusion of waters from the [303(d)] list *were enforceable and were causing* the [impaired waters] to attain applicable water quality standards or were reasonably expected to lead to the attainment of water quality standards") (emphasis added).

EPA guidance on this issue further underscores that 40 C.F.R. § 130.7(b)(1) only allows an impaired water to be left off a 303(d) List if there are mandatory legal requirements in place that will ensure that the water will meet WQS within a reasonable time.  R. 1343, 1386-87.  For example, when discussing whether it is appropriate for a water to be left off the 303(d) list because some set of "requirements" will resolve the water's impairment, EPA has stated:

> If the Agency determines that the controls cited are not, in fact, 'requirements,' or that they will not result in attainment of applicable water quality standards within a reasonable time, then EPA may disapprove the state's failure to include the segment at issue on the section 303(d) list … and add the segment to the list.

R. 1343 (2006 Guidance), 1386-87 (2004 Guidance) (to qualify as a sufficient control there must be "adequate documentation that the *required* control mechanisms will address all major pollutant sources

---

[8] In full, 40 C.F.R. § 130.7(b)(1) provides: "Each State shall identify those water quality limited segments still requiring TMDLs within its boundaries for which: (i) technology based effluent limitations *required by* sections 301(b), 306, 307, or other sections of the Act; (ii) more stringent effluent limitations (including prohibitions) *required by* either State or local authority preserved by section 510 of the Act, or Federal authority (law, regulation, or treaty); and (iii) other pollution control requirements (e.g., best management practices *required by* local, State, or Federal authority are not stringent enough to implement any water quality standards (WQS) applicable to such waters." (Emphasis added).

and establish a clear link between the control mechanisms and WQSs") (emphasis added).

The "other actions" EPA referred to in its explanation for not adding *M. aeruginosa* and the toxin to the 2006 303(d) List cited are not legally mandatory, enforceable requirements, however. The "other actions" EPA referred to in its decision are: the Klamath River Blue Green Algae Working Group, the draft TMDLs for the Lower Lost River, the development of TMDLs for the nutrient, dissolved oxygen, and temperature impairments in the Klamath River; the Statewide Blue Green Algae Work Group, and a Resolution of the North Coast Regional Board to work with interested parties to resolve the blue green algae problem. R. 45-46. None of these "actions" constitute legally mandatory requirements that will cause the Reach to attain applicable WQS.

The Klamath River Blue Green Algae Working Group is described by EPA as

> comprised of tribal, local, state, and federal entities, and landowners in the Klamath Basin […]. The working group administers funding to conduct a two-year study of the presence, distribution and possible causes of blue-green algae in the Klamath Basin. The group oversees the study and *will help* translate the results into management actions to reduce the occurrence, frequency, and/or duration of these blooms.

R. 45 (emphasis added). No other information regarding the working group is provided in the record. This working group has not adopted and lacks the sovereign authority to adopt enforceable pollution control measures that will bring the Reach into compliance with WQS. Moreover, as EPA admits, any possible management actions that this group will suggest will not occur until some as yet undetermined date in the future – not the reasonable period of time required by EPA guidance documents. *Id.*

The Lower Lost River TMDLs also do not constitute legally mandatory requirements that will cause the Reach to attain applicable WQS. First, the Lower Lost River TMDLs are still in draft form and thus not conceivably presently effective legal requirements that will bring the Reach into compliance with all applicable WQS. Second, there is no and could be no evidence in the Administrative Record to support a finding that implementation of the Lower Lost River TMDLs will curb *M. aeruginosa* and the toxin in the Reach. These TMDLs do not even exist yet, making it impossible to reasonably identify the effect they will have on the levels of algal blooms in the Reach. Third, even if the Lower Lost River TMDLs had presently been finalized, the TMDLs could not be seen as themselves legal requirements that will bring the Reach into compliance with all applicable WQS within a reasonable time. "A TMDL is not self-enforcing, but serves as an informational tool or

goal for the establishment of further pollution controls." *City of Arcadia v. EPA*, 411 F.3d 1103, 1105 (9th Cir. 2005) (citing *Pronsolino*, 291 F.3d at 1128-29); *see also* R. 1386 (2004 Guidance) ("Although TMDLs play an important informational role in the CWA's regulatory scheme, they are not regulations, and they do not impose legal obligations or prohibitions on polluters."). Since a TMDL itself does not impose any requirements, it cannot be relied upon as the basis for deciding that control measures "required by" local, State, or federal law will ensure that the algae and toxin do not cause violations of WQS. *See* 40 C.F.R. § 130.7(b)(1).

The future development of TMDLs for the Klamath River for nutrient, dissolved oxygen, and temperature impairments also do not constitute legally mandatory requirements that will cause the Reach to attain applicable WQS. Again, these TMDLs have not yet been adopted and are thus in no sense legal requirements. Furthermore, until these Klamath River TMDLs have been completed, EPA could have no basis for concluding that what they will require curtail the impairment of the Reach due to contamination by *M. aeruginosa* and the toxin within a reasonable time.[9] Finally, as noted, even if these TMDLs had been finalized, a TMDL is not, in itself, enforceable so as to be a measure "required by" law. *City of Arcadia*, 411 F.3d at 1105.

California's Statewide Blue Green Algae Work Group also does not constitute a legally mandatory requirement that will cause the Reach to attain applicable WQS. The EPA notes that this work group "recently posted draft voluntary guidance to protect people, pets, and livestock from the effects harmful algae blooms," and states that the "State Board has allocated funding for statewide sampling and analysis of blue-green algae … including some sample collection in [the] Klamath River." R. 45-46. This group's work has not to date involved and does not appear directed in the future toward the adoption of legally mandatory control measures to address *M. aeruginosa* and the toxin in the Reach. The Group's "draft voluntary guidance" is obviously not law. Even if it were law, it merely informs public health agencies, medical practitioners, and the interested public of the dangers

---

[9] In fact, Plaintiff brought this suit to ensure that when the Klamath River TMDLs are completed, they will be required, not just promised, to address the algae and toxin. In any event, EPA and the State's claim that the TMDLs they hope to generate for the Klamath River will also address the algae and toxin is inapposite in this case. Relevant regulations demand that the algae and toxin be listed as among the pollutants impairing the Reach so that the TMDLs developed for the Klamath River will be required to address these pollutants. 40 C.F.R. § 130.7; 33 U.S.C. § 1313(d)(1)(A) and (C).

1 | posed by the algae and toxin, and establishes protocols to keep people and pets out of the water and
2 | away from danger. R. 628-66. In essence, this guidance provides the voluntary plan of action to take
3 | when WQS are violated, rather than for preventing WQS violations. *Id.*

4 |      The North Coast Regional Water Board Resolution R1-2007-0028 also does not constitute a
5 | legally mandatory requirement that will cause the Reach to attain applicable WQS. This Resolution is
6 | merely a statement of the Regional Board's intentions to examine and work on the *M. aeruginosa* and
7 | toxin contamination problem. R. 666, 672 ("[t]his Resolution is informational only, and is not intended
8 | to bind Pacificorp or any public agency with jurisdiction over Pacificorp.").

9 |      In sum, the five "other actions" EPA cites to justify its approval of the 2006 303(d) List and
10 | refusal to add *M. aeruginosa* and the toxin to the List are not controls "required by" local, state, or
11 | federal law. Therefore, EPA could not rely on these actions for not adopting a revised 303(d) List that
12 | identifies *M. aeruginosa* and the toxin as pollutants causing the Reach not to meet applicable WQS,
13 | despite EPA's apparent belief that this is the preferable policy choice. As the Supreme Court recently
14 | made clear, EPA must follow the dictates of the law and exercise its discretion within the limits of that
15 | law. *Massachusetts v. EPA*, 127 S. Ct. 1438, 1462-1463 (2007). In this case, the EPA has departed
16 | from the requirements of CWA § 303(d) and 40 C.F.R. § 130.7(b)(4) to ensure that the 2006 303(d)
17 | List identify all pollutants causing violations of WQS in the Reach in favor of an extra-legal policy
18 | approach of relying on alternate means to address *M. aeruginosa* and toxin problem. Even if EPA were
19 | correct that the five alternative measures it called out in its approval of the 2006 303(d) List constitute
20 | a sound policy approach to the *M. aeruginosa* and toxin problem, this would provide EPA no
21 | justification for failing to do what the law requires. *See id.*

22 | **B. The Court Should Set Aside EPA's Approval of the 2006 303(d) List and Issue**
23 |     **Appropriate Declaratory Relief**

24 |      In accord with the APA, the Court should set aside EPA's approval of the 2006 303(d) List.
25 | *See* 5 U.S.C. § 706(2); *Friends of Pinto Creek v. EPA*, 2007 U.S. App. LEXIS 23251, *26 (9th Cir.
26 | 2007); *Abramowitz v. EPA*, 832 F.2d 1071, 1078 (9th Cir.1987). As Riverkeeper has demonstrated, the
27 | Administrative Record before EPA establishes that *M. aeruginosa* and the toxin are pollutants causing
28 | the Reach not to attain WQS set forth in the Basin Plan and EPA regulations require that a 303(d) List

identify *all* pollutants causing an impaired water not to meet applicable WQS.  Remarkably, however, EPA expressly admitted that when it approved the 2006 303(d) List, it did not consider whether *M. aeruginosa* and the toxin are pollutants and whether there are WQS that relate to *M. aeruginosa* and the toxin contamination of the Reach.  In failing to consider the primarily relevant factors for approval of a 303(d) List, i.e., whether the List identifies all pollutants that are causing a water body not to meet WQS, EPA acted in a manner arbitrary, capricious and contrary to law.  *See NRDC v. DOI*, 113 F.3d at 1124.

Riverkeeper additionally requests that the Court in a remand order direct EPA to take final action on approval of the 2006 303(d) List in accord both with the time deadlines established in CWA § 303(d)(2) and 40 C.F.R. § 130.7(d)(2) for EPA's review and approval of a State's submission of a 303(d) List and the substantive requirements for EPA action.  *See*, *e.g.*, *Natural Resources Defense Council v. EPA*, 966 F.2d 1292, 1299-1300 (9th Cir. 1992) (a court may compel EPA to take action within CWA deadlines); *Delaney v. EPA*, 898 F.2d 687, 691 (9th Cir. 1990) (same), *cert. denied*, *Reilly v. Delaney*, 498 U.S. 998 (1990).  Specifically, the Court should order EPA to issue a new decision disapproving the State's submitted 2006 303(d) List within thirty days of the Court's order setting aside EPA's approval of the 2006 303(d) List.  *See* 33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2) (establishing thirty day deadlines for EPA to approve or disapprove a submitted State 303(d) List).  The Court should further direct EPA, within sixty days of the Court's order, to issue a revised 2006 303(d) List that identifies *M. aeruginosa* and the toxin as pollutants causing the Reach not to meet narrative WQS.  *See id.* (establishing an additional thirty day deadline for EPA to issue its own 303(d) List after disapproving a State's submitted 303(d) List); s*ee Safe Air*, 488 F.3d at 1101-02 (remanding to agency with instructions to reconsider its action and apply the specific conclusions reached by the court in rendering its decision); *Sierra Club v. EPA*, 346 F.3d 955, 963 (9th Cir. 2003) (remand with instructions is appropriate remedy in certain circumstances).  On the Administrative Record before EPA, the only 303(d) List decision that would not be arbitrary and capricious and that would comply with CWA § 303(d) and 40 C.F.R. § 130.7(b)(4) would be one to identify these pollutants as among the pollutants causing the Reach not to meet applicable WQS.  *See Sierra Club*, 346 F.3d at 963.

To provide proper guidance to EPA on remand, Riverkeeper further requests that the Court

issue declaratory relief establishing: (1) that *M. aeruginosa* and the toxin are "pollutants" for purposes of California's 303(d) List, (2) that 40 C.F.R. § 130.7(b)(4) requires California and ultimately EPA to include in California's 303(d) List all pollutants that are causing or expected to cause an exceedance of WQS in the Reach, including the Reach's designated uses and the narrative water quality criteria for the Reach set forth in the Basin Plan, and (3) that the only EPA conclusion which would not be arbitrary and capricious given the Administrative Record would be that the presence of *M. aeruginosa* and the toxin is causing the Reach not to meet the Basin Plan's WQS.[10]  *See Sierra Club*, 346 F.3d at 963; *NRDC*, 966 F.2d at 1299-1300 (finding declaratory relief establishing legal requirements and delineating important elements of those requirements to be appropriate as "'a message not only to the parties but also to the public" (quoting *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1471 (9th Cir. 1984)); *Safe Air*, 488 F.3d at 1101-02.

## VI.    CONCLUSION

Riverkeeper respectfully requests the Court grant it summary judgment setting aside EPA's approval of the 2006 303(d) List and requiring EPA to issue a revised 303(d) List for California within sixty days that specifies that the Reach is not meeting WQS due to contamination by *M. aeruginosa* and the toxin.

Respectfully Submitted,

Dated:    December 19, 2007

_____/s/_____
Christopher Sproul
Drevet Hunt
Attorney for Plaintiff
KLAMATH RIVERKEEPER

---

[10] If Riverkeeper prevails in this matter, it will further request the Court for an award of costs and attorneys fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, by separate motion.